IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA,

v.                                                            Criminal Case No. 3:24cr105

SHEKEN JAMAL HOLBERT,

Defendant.

## MEMORANDUM OPINION

This matter comes before the Court on Defendant Sheken Jamal Holbert's Motion to

Dismiss Counts Five and Seven of the Indictment (the "Motion to Dismiss" or "Motion"). (ECF

No. 15.)[1] In the Motion, Mr. Holbert contends that his indictment under 18 U.S.C. § 922(g)(1)[2]

is unconstitutional both facially and as applied to him because laws that restrict a felon from

possessing a firearm as a felon "violate[] his Second Amendment right to keep and bear arms."

(ECF No. 15, at 1.) For the reasons articulated below, the Court will deny the Motion. (ECF

No. 15.)

---

[1] The Court employs the pagination assigned by the CM/ECF docketing system.

[2] Section 922(g)(1) provides:

> (g) It shall be unlawful for any person—
>
>> (1) who has been convicted in any court of, a crime punishable by
>> imprisonment for a term exceeding one year;
>> *       *       *
> to ship or transport in interstate or foreign commerce, or possess in or affecting
> commerce, any firearm or ammunition; or to receive any firearm or ammunition
> which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(1).

## I. Factual and Procedural Background

### A.     Factual Background

"The government alleges that . . . [on July 19, 2023 and July 26, 2023,] Mr. Holbert sold

drugs and a handgun to an undercover informant[.]" (ECF No. 15, at 3.)  On both occasions, Mr.

Holbert "possessed the firearm before selling and handing it over to the police informant." (ECF

No. 17, at 2.)  Before July 2023, Mr. Holbert had been convicted and sentenced for felony drug

possession.  (ECF No. 17, at 2.)

### B.     Procedural Background

On July 16, 2024, a grand jury returned a nine-count indictment against Mr. Holbert,

including six counts of Distributing Controlled Substances, one count of Using and Carrying a

Firearm During and In Relation to a Felony Drug Trafficking Crime, and two counts of

Possession of a Firearm by a Convicted Felon in violation of 18 U.S.C. § 922(g)(1).  (ECF No. 1,

at 1–5.)  On July 30, 2024, Mr. Holbert appeared before this Court and pleaded not guilty, (ECF

No. 13), and is awaiting trial in this matter.  Mr. Holbert filed this Motion to Dismiss, (ECF No.

15), the United States responded, (ECF No. 17), and Mr. Holbert replied.  (ECF No. 18.)

Accordingly, this matter is ripe for disposition.

## II. Standard of Review

### A.     Motion to Dismiss Indictment Under Fed. R. Crim. P. 12

Federal Rule of Criminal Procedure 12 allows parties to "raise by pretrial motion any

defense, objection, or request that the court can determine without a trial on the merits." Fed. R.

Crim. P. 12(b)(1).  Mr. Holbert raises facial and as-applied challenges to the constitutionality of

§ 922(g)(1), arguing that it violates the Second Amendment.  (ECF No. 15, at 1.)  "Fed. R. Crim. P. 12(b)(3)(B)[3] permits a court to dismiss a defective indictment.  An indictment is defective if it alleges a violation of an unconstitutional statute." *United States v. Brown*, 715 F.Supp.2d 688, 689 (E.D. Va. 2010) (citing *In re Civil Rights Cases*, 109 U.S. 3, 8–9 (1883)); *see also United States v. Hill*, 703 F.Supp.3d 729, 732 (E.D. Va. 2023).

**B.      Facial and As-Applied Challenges**

"To succeed in a facial constitutional challenge, a movant 'must establish that no set of circumstances exists under which the [law] would be valid.'" *United States v. Hosford*, 843 F.3d 161, 165 (4th Cir. 2016) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)); *see Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (stating that a facial challenge can only succeed when a party shows "that the law is unconstitutional in all of its applications").  "Because of this stringent standard, a facial challenge is perhaps 'the most

---

[3]  Rule 12(b)(3)(B) states:

> (b) PRETRIAL MOTIONS.
>
>      *     *     *     *
>
> (3) *Motions That Must Be Made Before Trial*.  The following defenses, objections, and requests must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits:
>
>      *     *     *     *
>
> (B) a defect in the indictment or information, including;
>
> (v) failure to state an offense[.]

Fed. R. Crim. P. 12(b)(3)(B).

difficult challenge to mount successfully.'" *Hosford*, 843 F.3d at 165 (quoting *Salerno*, 481 U.S. at 745).

"By contrast, '[a]n as-applied challenge requires only that the law is unconstitutional as applied to the challenger's case[.]'" *Hill*, 703 F.Supp.3d at 733 (quoting *United States v. Mgmt. Consulting, Inc.*, 636 F.Supp.3d 610, 619 (E.D. Va. 2022)). An as-applied challenge must be "based on a developed factual record and the application of a statute to a specific person." *Richmond Med. Ctr. for Women v. Herring*, 570 F.3d 165, 172 (4th Cir. 2009) (en banc).

**C.     Recent Supreme Court Second Amendment Decisions**

The Second Amendment to the Constitution of the United States provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. am. II.

Fifteen years ago, the United States Supreme Court decided *District of Columbia v. Heller*, 554 U.S. 570 (2008). Relying on the history of, and language in, the Second Amendment, *Heller* confirmed for the first time that the Second Amendment right to self-defense is an individual rather than a collective right limited to militias. *Id.* at 595. Soon after *Heller*, the Supreme Court determined that the Second Amendment applies to the states and local governments due to the Fourteenth Amendment's incorporation of the Bill of Rights. *McDonald v. City of Chicago*, 561 U.S. 742, 778 (2010). In these cases, the Supreme Court recognized that the Second and Fourteenth Amendments protected an individual's right to possess a firearm in one's home for self-defense.

In 2022, *Bruen* expanded *Heller* significantly by holding, "consistent with *Heller* and *McDonald*, that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,

4

597 U.S. 1, 10 (2022). *Bruen* elucidated a "text and history" test for evaluating Second Amendment challenges. *Bruen* explained that "*Heller*'s methodology centered on [the] constitutional text and history" of the Second Amendment rather than the then-universally applied means-end scrutiny test to "assess[] the constitutionality of a particular regulation." *Id.* at 22.

Pursuant to *Bruen*, to analyze a Second Amendment challenge, a court must first consider whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 17. If it does, "the Constitution presumptively protects that conduct", and "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24. The government may meet that burden by identifying "a well-established and representative historical analogue." *Id.* at 30. The *Bruen* Court strove to guide lower courts in this analysis by stating that "analogical reasoning under the Second Amendment is neither a regulatory straitjacket nor a regulatory blank check." *Id.*

In *United States v. Rahimi*—decided two years after *Bruen*—the Supreme Court upheld the constitutionality of 18 U.S.C. 922(g)(8), a statute that "prohibits [] individual[s] subject to a domestic violence restraining order from possessing a firearm" if the restraining order meets certain criteria. 602 U.S. 680, 684 (2024). In so holding, the Court reiterated its statement in *Heller* that "many such prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.'" *Id.* at 699 (quoting *Heller*, 554 U.S. at 626, 627, n.26). The Court explained: "we do not suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse." *Rahimi*, 602 U.S. at 698.

### III. Analysis

Mr. Holbert brings both facial and as-applied challenges to the constitutionality of

§ 922(g)(1).  He argues that Counts Five and Seven of his Indictment should be dismissed

because the statute under which he is indicted, 18 U.S.C. § 922(g)(1), is unconstitutional both

facially and as applied.  This Court already has carefully considered and rejected most of the

arguments Mr. Holbert raises in his Motion.  *See Hill*, 703 F.Supp.3d 729.

More pertinently, cases decided by the United States Court of Appeals for the Fourth

Circuit after Mr. Holbert filed his challenge defeat his attempts.

**A.      The Fourth Circuit Has Confirmed that Mr. Holbert Cannot Prevail on His
Facial Challenge to Section 922(g)(1)**

In briefing, Mr. Holbert acknowledges that that he "maintain[ed] his facial challenge . . .

only to preserve the issue for later review", citing *United States v. Canada*, in which the United

States Court of Appeals for the Fourth Circuit held that "Section 922(g)(1) is facially

constitutional[.]" (ECF No. 15, at 1, n.1) (citing 103 F.4th 257, 258 (4th Cir. 2024)).  Since that

time, the United States Supreme Court remanded the *Canada* case for reconsideration under

*Rahimi*. *Canada v. United States*, --- S. Ct. ---, 2024 WL 4654952 (Nov. 4, 2024).

On remand, the Fourth Circuit quickly dispensed with the facial constitutional challenge,

remarking that the standalone facial challenge to Section 922(g)(1) is not one of the "many

difficult questions" courts have grappled with post-*Bruen*. *United States v. Canada*, 123 F.4th

159, 161 (4th Cir. 2024) ("*Canada II*").  The Fourth Circuit observed that "[n]o matter which

analytical path we choose, they all lead to the same destination:  Section 922(g)(1) is facially

constitutional because it has a 'plainly legitimate sweep' and may constitutionally be applied in

at least *some* 'set of circumstances.'" *Canada II*, 123 F.4th at 161 (quoting *Wash. State Grange*

*v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (emphasis in original). *Canada II*

plainly forecloses any facial challenge to the constitutionality of § 922(g)(1).

**B.      Based on Its Own Precedent, the Fourth Circuit Has Ruled that Section 922(g)(1) is Constitutional As Applied to All Felons, Which Includes Mr. Holbert**

*Canada II* left open the viability of an as-applied challenge Section 922.  But *United*

*States v. Hunt*, 123 F.4th 697 (4th Cir. 2024), decided three weeks after *Canada II*, closed the

door to any as-applied challenge.

There, the Fourth Circuit dispensed with Mr. Hunt's as-applied challenge to Section

922(g)(1) altogether, rejecting it "without regard to the specific conviction that established his

inability to lawfully possess firearms." 123 F.4th at 700.[4]  The Fourth Circuit held that "neither

---

[4] For the record, Mr. Holbert argues that § 922(g)(1) is unconstitutional as applied to him because: (1) "[t]he Second Amendment's plain text protects the right of 'the people,' such as Mr. Holbert, to keep and bear arms"; and (2) there is "no 'historical tradition,' circa 1791, of gun regulations 'distinctly similar' to § 922(g)(1)." (ECF No. 15, at 7, 15.)  He suggests that *Rahimi* establishes that the Second Amendment's plain text applies to him as one of the people entitled to keep and bear arms. (ECF No. 15, at 1–2.)  In doing so, Mr. Holbert points to the following language:

> [I]n holding that Section 922(g)(8) is constitutional as applied to Rahimi, we reject the Government's contention that Rahimi may be disarmed simply because he is not "responsible." . . . "Responsible" is a vague term. In *Heller* and *Bruen*, we used the term "responsible" to describe the class of ordinary citizens who undoubtedly enjoy the Second Amendment right. . . But those decisions did not define the term and said nothing about the status of citizens who were not "responsible." The question was simply not presented.

*Rahimi*, 602 U.S. at 701–02 (citations omitted).  Mr. Holbert sought to stretch the comment that the term "responsible" is "vague" to apply to "[t]he phrase 'law-abiding.'" (ECF No. 15, at 8.)  Because "'law abiding' is as vague as 'responsible' in this framework", Mr. Holbert says, the *Rahimi* court decision meant that the Court did "not embrac[e] government's position that only 'law-abiding' citizens are part of the people." (ECF No. 15, at 8).  Not only does Mr. Holbert misread *Rahimi*, but it is also not clear how Mr. Holbert could successfully extend his logic regarding the term "responsible" when the Supreme Court explicitly said the meaning of "responsible" was not before it. *See Rahimi*, 602 U.S. at 701–02.  Even if Fourth Circuit law had not changed, the Court would not have been persuaded by this argument.

7

*Bruen* nor *Rahimi* meets this Court's stringent test for abrogating otherwise-controlling circuit precedent" because such decisions cannot be overruled or abrogated unless it is *"impossible"* to read that "precedent harmoniously with Supreme Court precedent." *Hunt*, 123 F.4th at 700, 702 (emphasis in original) (citing *Short v Hartman*, 87 F.4th 593, 605 (4th Cir. 2023)).

In the Fourth Circuit, a person convicted of a felony "cannot make out a successful as-applied challenge to Section 922(g)(1) 'unless the felony is pardoned or the law defining the crime of conviction is found unconstitutional or otherwise unlawful.'" *Hunt*, 123 F.4th at 700 (quoting *Hamilton v. Pallozzi*, 848 F.3d 614, 626 (4th Cir. 2017). For instance, an *en banc* panel of the Fourth Circuit recently held that *Bruen* did not abrogate a pre-*Bruen* decision finding restrictions on certain assault weapons constitutional. *Hunt*, 123 F.4th at 702–03 (citing *Bianchi v. Brown*, 111 F.4th 438, 448 (4th Cir. 2024) (*en banc*). Additionally, the Fourth Circuit readily concluded that all of its earlier decisions upholding the constitutionality of Section 922(g)(1)—including *United States v. Moore*, 666 F.3d 313 (4th Cir. 2012) and *United States v. Pruess*, 703 F.3d 242 (4th Cir. 2012)—could be read "harmoniously" with Supreme Court precedent. *Hunt*, 123 F.4th at 703. Nothing in *Bruen* or *Rahimi* rendered any Fourth Circuit case "untenable", so they must be followed. *Id.* (quoting *Short*, 87 F.4th at 605). The Fourth Circuit found Section 922(g)(1) constitutional both facially and as-applied.

In so ruling, the Fourth Circuit relied on two strands of authority to reject as-applied challenges to Section 922(g)(1):

    (1)    *Heller's* pronouncement that restrictions on firearms possession by those who have been convicted of felonies were "longstanding" and "presumptively lawful"; and

    (2)    a determination—stemming from *Heller*—that such individuals were, as a group, excluded from the category of "law-abiding,

responsible citizens" whose conduct is protected by the Second
Amendment.

*Hunt*, 123 F.4th at 703.

First, the *Hunt* court observed that the Supreme Court "has repeatedly reaffirmed"
*Heller*'s language recognizing the "longstanding and "presumptively lawful" restrictions
on felons possessing firearms. *Id.* *Bruen* described itself as in keeping with *Heller*,
while *McDonald* and *Rahimi* quoted, repeated, and reiterated assurances that
"longstanding", "presumptively lawful" restrictions on felons possessing firearms remain
in place. *Id.* at 703–04.

Second, the *Hunt* court found that the Fourth Circuit's pre-*Bruen* decisions that
"people who have been convicted of felonies are outside the group of 'law-abiding
responsible citizen[s]'" protected by the Second Amendment. *Id.* at 704 (brackets in
original) (citing *Moore*, 666 F.3d at 319). The cases found that the respective defendants
"undoubtedly flunk[ed] the 'law-abiding responsible citizen' requirement." *Moore*, 666
F.3d at 320; *Pruess*, 703 F.3d at 246. The Fourth Circuit concluded that both *Moore* and
*Pruess* were decided on *Bruen*'s first step; indeed, *Bruen* itself described the first step of
the now-rejected means-end scrutiny as "broadly consistent with *Heller*." *Hunt*, 123
F.4th at 704 (quoting *Bruen*, 597 U.S. at 19). Neither *Moore* nor *Pruess* relied on means-
end scrutiny rejected by *Bruen*; instead, both cases found that the defendant's conduct lay
outside of the Second Amendment's protection. *Hunt*, 123 F.4th at 704.

In sum, Mr. Holbert cannot meet the Fourth Circuit's "stringent test for
abrogating otherwise-controlling circuit precedent," rendering earlier findings that
Section 922(g)(1) is not unconstitutional, as applied, binding. *Id.* at 700. Earlier
decisions can be read harmoniously with Supreme Court precedent and have not been

9

rendered "untenable" by any Supreme Court case. *Id.* at 703. The Fourth Circuit has

held that *Bruen* and *Rahimi* do not provide any "basis for a panel to depart from [the

Fourth Circuit's] previous rejection of the need for any case-by-case inquiry about

whether a felon may be barred from possessing firearms." *Id.* at 704 (citing *Hamilton*,

848 F.3d at 626–29).

### C.       Even if the *Bruen* Analysis Were Used, Any As-Applied Challenge to the Constitutionality of Section 922(g)(1) Could Not Prevail

But the Fourth Circuit did not just rely on its own decisions. Supreme Court

precedent supported its findings. Aligning itself with the United States Court of Appeals

for the Eighth Circuit, the Fourth Circuit concluded that, even under a *Bruen* analysis,

"'there is no need for felony-by-felony litigation regarding the constitutionality of §

922(g)(1).'" *Hunt*, 123 F.4th at 708 (quoting *United States v. Jackson*, 110 F.4th 1120,

1125 (8th Cir. 2024).

The two-part *Bruen* analysis involves first considering whether the "challenged

law regulates activity falling outside the scope of the [Second Amendment] as originally

understood." *Hunt*, 123 F.4th at 704 (brackets in original) (quoting *Bruen*, 597 U.S. at

18). If it does regulate such actively, a court turns to *Bruen*'s second step. There, "the

government must demonstrate that the regulation is consistent with this Nation's

historical tradition of firearm regulation." *Hunt*, 123 F.4th at 704 (quoting *Bruen*, 597

U.S. at 17).

### 1.       *Bruen*'s First Step

The *Hunt* court turned to *Rahimi* to conduct its analysis. When addressing the as-applied

challenge to Section 922(g)(1), the *Hunt* court observed that when assessing modern regulations,

per *Rahimi*, courts need not identify a "dead ringer" or "historical twin" for a founding-era

regulation, only a well-established and representative "'historical analogue." *Hunt*, 123 F.4th at 705 (quoting *Rahimi*, 602 U.S. at 692). In *Rahimi*, "the Court emphasized that neither *Heller* nor *Bruen* 'suggest[s] a law trapped in amber'" nor that it find an "'identical'" regulation. *Hunt*, 123 F.4th at 705 (quoting *Rahimi*, 602 U.S. at 691–92). "Instead, the relevant question is 'whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition.'" *Hunt*, 123 F.4th at 705 (emphasis in original) (quoting *Rahimi*, 602 U.S. at 692). *Bruen* directs that, when evaluating the similarity of a regulation, a court should assess "how and why the regulations burden a law-abiding citizen's right to self-defense." *Bruen*, 597 U.S. at 29; *see also Hunt*, 123 F.4th at 705.

The *Hunt* court concluded, at *Bruen* step one, that Section 922(g)(1) regulated activity outside of the scope of the Second Amendment as originally understood. *Hunt*, 123 F.4th at 705. *Hunt* looked "to the historical scope of the Second Amendment" and used that history to interpret what was or was not protected by the constitutional text. *Hunt*, 123 F.4th at 705 (quoting *United States v. Price*, 111 F.4th 392, 401 (4th Cir. 2024) (*en banc*). The Fourth Circuit saw that "*Heller* instructs that the 'pre-existing right' 'codified' in the Second Amendment protect firearms protection by the law-abiding, not by felons." *Hunt*, 123 F.4th at 705 (quoting *Heller*, 554 U.S. at 592). Nothing in *Bruen*, *Rahimi*, or the Fourth Circuit's decision in *Price* alters the finding that "Section 922(g)(1) 'regulates activity'—that is, the possession of firearms by felons—that 'falls outside the scope of the Second Amendment right as originally understood.'" *Hunt*, 123 F.4th at 705 (quoting *Bruen*, 597 U.S. at 18) (cleaned up).

This is true because *Heller* repeatedly described the core of the Second Amendment right as protecting "law-abiding" citizens. *Hunt*, 123 F.4th at 705 (quoting *Heller*, 554 U.S. at 625, 635). *Heller* also made "clear that restrictions on firearms possession by those who are not law-

11

abiding—*i.e.*, felons—are 'presumptively lawful.'" *Hunt*, 123 F.4th at 705 (quoting *Heller*, 554 U.S. at 626, 627 n.26). The regulation of possession of firearms by felons falls outside the scope of the Second Amendment as originally understood. Not only do *Bruen* and *Rahimi* not change this, *Rahimi* reiterated that "prohibitions. . . on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful. *Hunt*, 123 F.4th at 705 (quoting *Rahimi*, 602 U.S. at 699 (quoting *Heller*, 554 U.S. at 626, 627 n.26.))

### 2.    *Bruen*'s Second Step

Following *Rahimi's* analytical framework of "[w]hy and how the regulation burdens the right", the Fourth Circuit turned to whether the challenged regulation remains "consistent with the *principles* that underpin our regulatory tradition." *Hunt*, 123 F.4th at 705 (emphasis in original) (quoting *Rahimi*, 602 U.S. at 692). As stated above, the *Hunt* court identified that it need not find a regulatory "dead ringer" or "historical twin," and that "only a historical analogue is required." *Hunt*, 123 F.4th at 705 (quoting *Rahimi*, 602 U.S. at 692, 701) (internal quotation marks omitted).

The Fourth Circuit "'conclude[d] that legislatures traditionally employed status-based restrictions to disqualify categories of persons from possessing firearms' and that 'Congress acted within [that] historical tradition when it enacted § 922(g)(1).'" *Hunt*, 123 F.4th at 705–06 (quoting *United States v. Jackson*, 110 F.4th 1120, 1129 (8th Cir. 2024)). Two stains of thought, or underlying principles, underscore earlier legislative restrictions pertaining to the pre-existing right of law-abiding citizens to possess firearms. Historians have recognized that, at the founding, the law maintained that "people should have a right to bear arms '*unless for crimes committed*, or real danger of public injury from individuals.'" *Hunt*, 123 F.4th at 706 (emphasis in original) (internal citation omitted).

12

First, legislatures historically have justified restricting groups of people from possessing firearms "to address a danger of misuse by those who deviated from legal norms." *Hunt*, 123 F.4th at 706 (quoting *Jackson*, 110 F.4th at 1127). This historical tradition includes analogous laws that disarmed "'non-Anglican Protestants who refused to participate in the Church of England'" and "'people who refused to declare an oath of loyalty.'" *Hunt*, 123 F.4th at 706 (quoting *Jackson*, 110 F.4th at 1126). "Just as early legislatures retained the discretion to disarm categories of people because they refused to adhere to legal norms in the pre-colonial and colonial era, today's legislatures may disarm people who have been convicted of conduct the legislature considers serious enough to render it a felony." *Hunt*, 123 F.4th at 707.

Second, the historical regulation of firearms possession included the disarmament of "particular people 'to address a risk of dangerousness,' which readily attaches to people who have already been found guilty of having broken the law." *Hunt*, 123 F.4th at 706 (quoting *United States v. Jackson*, 110 F.4th at 1127. Albeit substantively at odds with current norms as to race and religion, early legislatures deemed "Catholics", "Native Americans" or "non-oath takers" potentially too dangerous or violent to be permitted to bear arms. *Hunt*, 123 F.4th at 707. Thankfully, these now-improper *bases* for separating these groups are not "trapped in amber." *Id.* at 705; *Rahimi*, 602 U.S. at 691. But the *analytical upshot* of these laws tells us that, rather than requiring an individualized determination of dangerousness per person, historically analogous laws found that "past conduct (like committing a felony) can warrant keeping firearms away from persons who 'might be expected to misuse them.'" *Hunt*, 123 F.4th at 707 (quoting *Jackson*, 110 F.4th at 1128). Congress has not infrequently acted to curb access to firearms for those who are potentially irresponsible and dangerous, including felons who—as a group—by "definition, have 'demonstrated disrespect for legal norms of society.'" *Hunt*, 123 F.4th at 708

13

(quoting *Jackson*, 110 F.4th at 1128). The *Rahimi* court evaluated the constitutionality of 18 U.S.C. § 922(g)(8), which prohibits individuals subject to a domestic violence restraining order from possessing a firearm. The eight-person *Rahimi* majority found that the country's "tradition of firearm regulation allows the Government to disarm individuals who present a credible threat to the physical safety of others."[5] *Rahimi*, 602 U.S. at 700.

Both strains of legislative thought accord with historical tradition regulating non-law-abiding persons and are consistent with the Supreme Court's repeated instruction that

---

[5]   This Court is aware that *Rahimi* reached its conclusion about historical restrictions on firearms possession via an entirely different path. For instance, *Rahimi* proclaims that "[f]rom the earliest days of the common law, firearm regulations have included provisions barring people from misusing weapons to harm or menace others." *Id.* at 693. "Parliament," *Rahimi* observes, "began codifying prohibitions against such conduct as early as the 1200s and 1300s, most notably in the Statute of Northampton of 1328." *Id.* at 694 (citing *Bruen*, 597 U.S. at 40). *Rahimi* states that, by the time of the founding, the "state constitutions and the Second Amendment had largely eliminated governmental authority to disarm political opponents on this side of the Atlantic," citing *Heller*, 554 U.S. at 594–95, but that "regulations targeting individuals who physically threatened others persisted." *Rahimi*, 602 U.S. at 694.

The *Rahimi* court states that by the 1700s and early 1800's, two distinct legal regimes had developed that specifically addressed firearms violence: (1) surety laws and (2) going armed laws. *Id.* at 695–97. Citing a 1917 Yale Law Journal article by A. Lefroy, the majority observes that the surety laws evolved from "ancient practice of frankpledges" which "[r]eputedly date to the time of Canute", meaning about 1016–1035. *Id.* at 695.

As to the "going armed laws", the majority found those traceable to the Statue of Northampton in 1328, developed from the "common-law prohibition on affrays." *Id.* at 697 ("Although the prototypical affray involved fighting in public, commentators understood affrays to encompass the offense of 'arm[ing]' oneself 'to the Terror of People.'" (citing T. Barlow, The Justice of the Peace: A Treatise 11 (1745)). Among other laws or traditions, the Court turned to historical context from 1783 "restrictions on gun use by drunken New Year's Eve revelers." *Rahimi*, 602 U.S. at 691. The *Rahimi* Court eventually held: "[l]ike the surety and going armed laws, Section 922(g)(8)(C)(i) applies to individuals found to threaten the physical safety of another." *Id.* at 698.

The Fourth Circuit relied on *Rahimi* as well but decided that Section 922(g)(1) was constitutional as applied, *absent* any felony-by-felony analysis. *Hunt*, 123 F.4th at 708.

14

longstanding prohibitions "on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.'" *Hunt*, 123 F.4th at 704 (quoting *Rahimi*, 602 U.S. at 682) (other citations removed). For the reasons articulated above, "'there is no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1)'" meaning this Court must reject Mr. Holbert's "as-applied constitutional challenge at step two of the *Bruen* analysis as well." *Hunt*, 123 F.4th at 700 (quoting *Jackson*, 110 F.4th 1125). Mr. Holbert cannot prevail on his as-applied challenge to the constitutionality of Section 922(g)(1).

## IV. Commentary on *Bruen* Analysis

Despite the ease with which the Court may decide Mr. Holbert's case given the commonsensical and legally disciplined findings by the Fourth Circuit in *Hunt*, this Court feels constrained to again observe that the *Bruen* analytical framework envisioned by the Supreme Court defies an "intellectually accurate" application that "would ensure 'the consistent and uniform development and application of the law.'" *See Hill*, 703 F.Supp.3d at 742 (quoting *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 282 (4th Cir. 2019)).

*Rahimi* has made things worse. In *Rahimi*, the United States Supreme Court demonstrates that history repeats itself everywhere except in Second Amendment jurisprudence. The historical underpinning this Court should (technically speaking) consider has metastasized.

*Bruen* announced a text *and history* test. *Bruen*, 597 U.S. at 38–39. When the Supreme Court writes law, I read the cases they incorporate. I am not comfortable ignoring Supreme Court *historical* precedent. It seems certain to create inconsistent and unreliable results no matter which historical path I take. *See Hill*, 703 F.Supp.3d at 745–46. At least the Court

15

currently has the post-*Rahimi Hunt* case which I am bound to, and can, follow. But that is not likely to always hold true.

I still harbor concern that the *Breun* analysis is unworkable for a United States District Court (and possibly appellate courts). In its *Hill* decision, this Court took pains to articulate exactly the problem it faced. I will not—and cannot—repeat that litany of observations. Suffice it to say that the record at bar is as jumbled as that in *Hill*.

For instance, adding *Rahimi* to the mix has meant that practitioners can't keep up. From a briefing perspective, the parties have presented essentially identical historical arguments this Court was unable to grapple with before in *Hill*. For instance, the United States again cites a plethora of historical documents this Court cannot evaluate—all while Mr. Holbert's speedy trial clock ticks because he remains incarcerated pending trial.[6] (*See, e.g.*, ECF No. 17, at 13 n.2) (citing Calendar of State Papers, Domestic Series, Charles II, 1661-1662, at 538 (Nov. 1, 1662) (Mary Anne Everett Green ed., 1861)); ECF No. 17, at 14 n.6 (citing parliamentary speeches by Lords Amherst and Stormont from 1780 using an 1814 source); (ECF No. 17, at 14 n.7 (citing two magazine articles from 1780); *see also Hill*, 703 F.Supp.3d at 744–45, n. 25–32). Both parties discuss *Rahimi* based largely on those unaltered and prolific records, and they do so only briefly. They cite substantively different historical and academic records. The constitutional scholars and historians they cite disagree with each other about the Founders' intent. *Hill*, 703 F.Supp.3d at 752 (citing *Jackson*, 661 F.Supp.3d at 407). The citations supporting their arguments barely overlap. While the Supreme Court has said that lower courts should decide on

---

[6] This is no criticism of the briefing from the parties. It is likely that the United States Department of Justice and the national leadership of the Federal Public Defender must take and maintain consistent positions when litigating what the Court presumes are hundreds of Second Amendment challenges across the country and in United States territories.

the records presented to them, this Court's historical record departs materially from those cited by the Supreme Court. *See Bruen*, 703 F.Supp.3d at 747–48.

Moreover, the parties do not cite a vast number of the historical findings underpinning the seminal Supreme Court cases. No brief at bar attempts to incorporate almost any of the over-200 citations the Supreme Court added in *Rahimi* to *Bruen*'s historical record. Nor do they attempt to incorporate the majority of the over-50 citations that appear in *Bruen* but not in *Rahimi*. Nor do they attempt to integrate 50-or-so historical citations that are not in *Bruen or Rahimi* which the Fourth Circuit added to a most recent Second Amendment analysis in *Maryland Shall Issue v. Moore*, 116 F.4th 211 (4th Cir. 2024). These discrepancies cannot fully be explained by the fact that these cases evaluate different applications of the Second Amendment.

Even presuming they could be harmonized, the Supreme Court's historical explications are also beyond those I can—practically—gather and absorb. I do not have ready access to the 1917 Yale Law Journal article by A. Lefroy the *Rahimi* majority cites, nor can I easily embrace the findings that the surety laws evolved from "ancient practice of frankpledges" which "[r]eputedly date to the time of Canute" (meaning about 1016-1035). *Rahimi*, 602 U.S. at 695. The historical analysis suggested by *Bruen* and *Rahimi* does not rely on unassailable facts (such as the date the Declaration of Independence was signed) but turns on historical facts that remain subject to debate. *Hill*, 703 F.3d. at 742–43. This Court does not have the resources to carry the burden of conducting a historical analysis of the myriad citations practitioners and the Supreme Court articulate, especially given the number of cases before it.

As stated before, this Court sees no way to make "an intellectually honest or academically accurate record" were it to follow the seemingly innumerable historical documents

that underlie the "*history*" part of *Bruen*'s "text" and "*history*" test. *Id.* at 747. When a court tries to harmonize or even apply the vast historical records before it—now multiplying at geometric rates—it becomes evident that "[t]here is no law of history any more than of a kaleidoscope." *Either the ladder or the wheel*, The Herald (May 7, 2000), https://www.heraldscotland.com/news/12188704.either-the-ladder-or-the-wheel/. This Court has previously observed that "an accurate and thoughtful reading of 18 U.S.C. 922(g)(1) under *Bruen* in *any* particular case or controversy is encumbered by the variation among records from which district courts must rule, speedy trial concerns, and the nebulous meaning of phrases such as longstanding 'societal problems,' 'unprecedented societal concerns,' and 'comparable burden.'" *Hill*, 703 F.Supp.3d at 742 (quoting *Bruen*, 597 at 27, 29, 36).

It is a bedrock principle of American jurisprudence that it is the "province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803). This Court struggles with the notion that this province and duty of the judicial department can also include the ability or necessity to say what history is. Judges are not historians. *Bruen*, 592 U.S. at 107 (Breyer, J., dissenting).

### V. Conclusion

For the foregoing reason, the Court will DENY Mr. Holbert's Motion to Dismiss. (ECF No. 15.)

An appropriate Order shall issue.

Date: 1/19/25
Richmond, Virginia

/s/
M. Hannah Lauck
United States District Judge

18